## REISS v. NATIONAL QUOTATION BUREAU, Inc.

(District Court, S. D. New York. November 15, 1921.)

Copyrights ⊕⇒5—Cable code book held subject of copyright; "writing of an author."

A code book containing a large number of coined words having no known meaning, but adapted to be given an agreed meaning for the purpose of cable correspondence, *held* the writing of an author, within article 1, § 8, of the Constitution, and a proper subject of copyright, under Act March 4, 1909 (Comp. St. § 9517 et seq.).

In Equity. Suit by Edward W. Reiss against the National Quotation Bureau, Inc. On motion to dismiss bill. Denied.

This is a motion under the equity rules to dismiss a bill of complaint upon a copyright. The only question raised is of the validity of the copyright,

which was for a book called "'Simplix' Pocket Blank Code." It contained a title page not alleged to be infringed, and its contents consisted of nothing but 6,325 coined words of 5 letters each, numbered consecutively from 38,495 to 44,819, inclusive. The words had no meaning, but were all susceptible of pronunciation. They were carefully prepared in accordance with the requirements of the cable companies to serve as a cable code, and the book was sold to those who might make out of it a private code, by agreeing upon meanings to be given to as many of the coined words as they chose. The publisher could also use the words as the basis for codes made up by himself.

Alan N. Mann, of New York City, for the motion.
George H. Gilman, of New York City, opposed.

LEARNED HAND, District Judge (after stating the facts as above). Section 4 of the Copyright Act of 1909 (Comp. St. § 9520) enacts that copyrightable works "shall include all the writings of an author," and section 5 (section 9521) especially provides against taking the enumeration which it contains as exclusive. The act must therefore be understood as meaning to cover all those compositions which, under the Constitution, can be copyrighted at all. The defendants place themselves, as indeed they must, squarely upon the meaning of section 8 of article 1. If a series of coined words such as this is not the "writing" of an "author," as the Constitution uses that word, then the motion succeeds; if not, it fails.

If the defendants' point is good, it can only be because, to be within the Constitution, the "writing" must already have a meaning. These words have a prospective meaning, but as yet they have not received, it, like an empty pitcher. Suppose some one devised a set of words or symbols to form a new abstract speech, with inflections, but as yet with no meaning, a kind of blank Esperanto. The case would be approaching the plaintiff's, though not there, because the words would, indeed, express relationship. Mathematics has its symbols, indeed a language of its own, Peanese, understood by only a few people in the world. Suppose a mathematician were to devise a new set of compressed and more abstract symbols, and left them for some conventional meaning to be filled in. Still we should not be quite at the plaintiff's words, but again we should not be far away. The distinction is real, but for practical purposes seems to me irrelevant.

Not all words communicate ideas; some are mere spontaneous ejaculations. Some are used for their sound alone, like nursery jingles, or the rhymes of children in their play. Might not some one, with a gift for catching syllables, devise others? There has of late been prose written, avowedly senseless, but designd by its sound alone to produce an emotion. Conceivably there may arise a poet who strings together words without rational sequence—perhaps even coined syllables—through whose beauty, cadence, meter, and rhyme he may seek to make poetry. Music is not normally a representative art, yet it is a "writing." There are meaningless rhymes—e. g., "Barbara celarent" which boys use in their logic, or to remember their paradigms or the rules of grammar.

Works of plastic art need not be pictorial. They may be merely patterns, or designs, and yet they are within the statute. A pat-

tern or an ornamental design depicts nothing; it merely pleases the eye. If such models or paintings are "writings," I can see no reason why words should not be such because they communicate nothing. They may have their uses for all that, æsthetic or practical, and they may be the productions of high ingenuity, or even genius. Therefore, on principle, there appears to me no reason to limit the Constitution in ·any such way as the defendants require.

I can find nothing in the American reports remotely relevant. Baker v. Selden, 101 U. S. 99, 25 L. Ed. 841, is too foreign to the case at bar to deserve comment. Higgins v. Keuffel, 140 U. S. 428, 11 Sup. Ct. 731, 35 L. Ed. 470, turns on quite another point. In National etc., Co. v. Western Union Tel. Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805, there was no composition whatever. In Ager v. Collingsridge, 2 Times L. R. 291, however, the point was squarely decided in the plaintiff's favor, though without comment. In Ager v. P. & O. S. S. Co., L. R. 26 Ch. Div. 637, it appears not even to have been argued by the defendant. Now it is argued that these cases are distinguishable, because they arose under an act of Parliament which was not limited by any Constitution. So, indeed, they were, and if our Constitution embalms inflexibly the habits of 1789 there may be something in the point. But it does not; its grants of power to Congress comprise, not only what was then known, but what the ingenuity of men should devise thereafter. Of course, the new subject-matter must have some relation to the grant; but we interpret it by the general practices of civilized peoples in similar fields, for it is not a strait-jacket, but a charter for a living people.

The motion is denied.