**APPLE COMPUTER, INC.**

v.

**FRANKLIN COMPUTER CORP.**

Civ. A. No. 82–2107.

United States District Court,
E. D. Pennsylvania.

July 30, 1982.

Ronald Panitch, Philadelphia, Pa., for plaintiff.

Manny Pokotilow, Jerome Shestack, Philadelphia, Pa., for defendant.

NEWCOMER, District Judge.

Plaintiff Apple Computer, Inc., ("Apple") moves for a preliminary injunction restraining defendant Franklin Computer Corp. ("Franklin") from using, copying, selling, or infringing in any other way Apple's registered copyrights on fourteen computer programs that are contained in or sold with the Apple II personal computer.

### I. The Parties

Apple is a California corporation, acknowledged to be a leader in the field of personal computers. It employs approximately 3,000 people and it has sold almost 400,000 computers. Apple had sales of $335,000,000 last fiscal year. Franklin is a Pennsylvania corporation, formed in 1981, with 75 employees. It has sold fewer than 1,000 computers.

For reasons more fully expressed below I have concluded that there is some doubt as to the copyrightability of the programs described in this litigation. Because of this doubt, I find that plaintiff has failed to show a reasonable probability of success on the merits and for that reason, as well as a failure to show irreparable harm, I must deny the motion.

### II. The Works

#### A. The "Computers"

The two machines in this case are the Apple II, made by Apple Computer, Inc., and the Ace 100, made by Franklin Computer Corporation. Both are generally referred to as microcomputers or personal computers because of their size and their

ease of use by individuals and small businesses.

Both computers contain a large flat circuit board, called a "mother board". Mounted on this board, forming the electronic circuitry which is the operating center of the computer, are a number of small integrated circuits or chips. These integrated circuits are described herein and are the focus of this lawsuit.

## B. The Integrated Circuits: CPU, RAMs, ROMs, PROMs and EPROMs

Personal computers contain a variety of integrated circuits, which are photo-chemically imprinted silicon chips.[1] Each integrated circuit, or chip, is constructed with a specific size memory or programming capacity. In microcomputers, the capacity of a chip may range from 4,000 bytes (4K of memory) to 64,000 bytes (64K of memory). One "byte" is one cell or one location point for information to be stored in the chip. In turn, on computers like Apple and Ace, each byte has eight "bits" (Binary digIT) each of which specifies the single value of "0" or "1", negative or positive.

Like all computers, both Apple and Ace have a central processing unit ("CPU") which is the specialized integrated circuit that executes binary programs. The CPU does the primary calculations required of all programs and shifts answers to other parts of the system depending upon the requirements of the program controlling it. On both Apple and Ace, the CPU uses a 6502 microprocessor chip which has a 64K storage capacity.

In addition to the CPU, which does the calculations, computers have internal memories that hold information generated within the computer or entered into the computer from an external source like a floppy disk or keyboard. The information may be stored in a permanent or impermanent ("volatile") form of memory. Some chips store information only as long as the machine is on; these are Random Access Memory chips (RAMs). When the power is turned off, the information stored in these chips is lost.

The information to be stored permanently is held in other chips called Read Only Memory (ROMs). Information stored in ROMs is not lost when the power is turned off. Information is stored in a ROM by destroying the fusible links that make up the structure of each byte, creating the equivalent of on-and-off switches arranged according to the specifications of the program to be imprinted in the ROM.[2]

For all practical purposes, the information stored in a ROM cannot be changed by the user of a computer. As the name suggests, the ROM contains information that can only be read. Nothing new can be added or "written" onto it. Of the 14 "works in suit," four of them are stored on ROMs.[3]

## C. Programs: Software, Interpreters, and Languages

Of signal difficulty in this case is the elasticity of the word "program." A computer program is a set of serial instructions that directs the computer to perform cer-

---

1. The integrated circuit inscribed on a chip is an electro-mechanical pattern that determines a sequence of electrical events that occur *within* a chip only when the chip is performing. *See* D. Fink, Computers and the Human Mind 131–177 (1966).

2. To program a ROM, program-designers use object-micro-code. This code is binary (base 2): "On/Off"; "Yes/No"; "1/0". The code can represent and control the pulse of electrical current. "The presence of such a pulse at a particular time represents the bit 1; the absence of a pulse at that time represents the bit 0." D. Fink, Computers and the Human Mind 135. The topography of the chip can be said to

be an electro-mechanical version of the subject code since it is an array of open or closed switches at which the pulse is present or absent.

3. There has been testimony that the ACE 100 contains EPROMs (Erasable Programmable Read Only Memory) rather than ROMs, but for purposes of this proceeding, the difference is inconsequential. EPROMs perform the same function as ROMs, but the information stored in them can be erased and the chip can be reprogrammed, whereas ROMs are manufactured with a fixed program.

tain tasks. A user does not instruct the operating center of the machine. The user writes programs that are expressed in "high level" languages resembling English. Depending on the circumstances, one or more special machine "programs" will in turn translate or "interpret" those instructions, given by the user, into a form of instruction that can be executed in the circuitry. At the level of the circuitry, programs are expressed in "low level" languages. At the very lowest level, every program is eventually reduced to "an object code," which is expressed in binary (base 2) numbers, a series of zeroes and ones that represent open and closed switches within the computer's circuits.

Object code is the heart of this case. In a crude way, object code that has been etched onto the ROM architecture can be "read" by an expert with a microscope and patience. However, the object code in either its binary form or in the silicon chip form is not designed to be read by humans. It is the machine's language.

At issue in this case are fourteen "programs" expressed in object code. These programs are either imprinted on the Apple's ROMs or the Ace's EPROM or they are enscribed on floppy disks which allow for easy storage and transmission to the computer's RAMs when the programs are needed.

All of these programs are "operating" programs as opposed to "application" programs. The distinction is based on the breadth of use and the function of the program. An application program has a specific task, ordinarily chosen by the user, such as to maintain records, perform certain calculations, or display graphic images. Application programs are normally written in high level languages which are designed to be easily used by the unsophisticated. An operating program, by contrast, is generally internal to the computer and is designed only to facilitate the operating of the application program.

D. Compatibility and Operating Systems

An operating system that consists of a variety of separate operating programs is in a sense a part of the machine; it provides the functioning system that allows the user to progress in an orderly fashion as he moves through the physical process of keying information into a computer. The operating system instructs the machine how to use this information and receives the solutions to the problems posed. Once in the machine, either permanently implanted as a ROM or entered from a floppy disk, an operating system is very nearly "transparent"; the user is not aware of the work and order of the work it is processing.

Because of the complex relationship between the physical elements of a computer (keyboard, screen, printer, disk drives, etc.) and the logic of the system that is both built into the CPU and added through high level languages, operating systems are critical to personal computers. Without them, every operation would require an impractical number of steps before it could be executed.

The operating system is configured to satisfy the requirements of the physical environment of the computer, especially the structure of the CPU, and to provide easy compatibility with software written in the general market place and with peripherals made by other manufacturers. The present litigation occurs because the Apple computer has stimulated the creation of an extraordinary amount of software and peripheral hardware that is only compatible with Apple. Most of this software and peripheral hardware was designed with Apple's operating system in mind, which means it will not work, except with great difficulty or restructuring, on machines other than those with the particular configuration of operating system and CPU that is found in the Apple.

Amateurs and small businessmen who buy small computers, like Apple, buy it not for its quality, although quality is not unimportant, but for the software and peripherals that are compatible with it. Franklin has "designed" a computer that is Apple-compatible. Essentially that means that the Ace was designed to run most, if not all,

of the software written for Apple by hundreds of entrepreneurs and to accept the peripherals manufactured by many others. Apple contends in this suit that Franklin has "stolen" the logic and structure of their system. Franklin contends that Apple has deprived non-Apple owners of the opportunity to take advantage of the wealth of Apple-compatible material that exists in the market place. Franklin's argument is that it has created not an Apple-compatible system but rather a system compatible with Apple-compatible software which must of necessity share a great deal of the essential structure of Apple, especially of the structure of Apple's operating system.

## E. The Works in Suit

The works upon which this action is based are in object code, stored in Read Only Memory (ROM) or on floppy disks.

### (1) Autostart ROM

The Autostart program, stored in ROM, is a collection of low-level subroutines ("booting" routines) that initiate registers and other circuitry in the Apple II when the power is turned on. It also performs a variety of hardware-oriented functions during operating, so that the machine can accept keystrokes and generate character graphics for video display.

### (2) Applesoft

The Applesoft program is Apple's version of BASIC ("Beginner's All-purpose Symbolic Instruction Code"), a higher level programming language that was originally developed at Dartmouth College. The Applesoft program is stored in ROM and is an interpreter program that processes BASIC statements, one statement at a time, and causes the computer to execute those instructions that implement the BASIC statement entered by the user.

### (3) DOS 3.3

The DOS 3.3 program is a disk-based, operating systems program. It provides the instructions necessary to control the operation between disk drive and the computer. It controls the reading and writing of the floppy disks and includes several other routines and subroutines, for example, the read-write-track-sector ("RWTS") which puts in sequence all the data transfers. RWTS starts various subprograms that perform certain low level functions such as reading and writing data.

### (4) Floating Point BASIC

The Floating Point BASIC is a disk-based version of the Applesoft program. In some modes of the Apple II computer it is loaded into the random-access memory (RAM) of a peripheral card, known as "Language Card," and is there available for the user's programming. Floating Point BASIC is used in earlier versions of the Apple II computer that do not have the Applesoft program in ROM.

### (5) Apple Integer BASIC

The Apple Integer BASIC is a disk-based program and was Apple's first version of BASIC for the Apple II computer. This program implements a simpler version of Apple's Applesoft and Floating Point BASIC programs.

### (6) Hello

The Hello program is a disk-based, operating systems program that is used in conjunction with Apple's DOS 3.3 operating system. After start-up, this program is the first program executed each time a floppy disk is "booted up." It determines how much Random Access Memory (RAM) is in the computer and which version of BASIC needs to be loaded into the computer.

### (7) Chain

The Chain program is a disk-based operating systems program that is used in conjunction with Apple's DOS 3.3 program. The Chain program allows data to be passed between program segments, only one of which is in RAM at any given time. The Chain program preserves RAM-based data during the time another program segment is being loaded into RAM.

### (8) Copy

The Copy program is a disk-based operating systems program that is used in conjunction with Apple's DOS 3.3 program. The Copy program is a utility program that enables the user to copy programs written in Apple Integer BASIC from one disk to another.

### (9) Copy A

The Copy A program is a disk-based operating systems program that is used in conjunction with Apple's DOS 3.3 program. The Copy A program is a utility program that enables the user to copy programs written in Applesoft from one disk to another.

### (10) Copy OBJO

The Copy OBJO program contains a file of subroutines used by the Copy and Copy A programs.

### (11) Boot 13

The Boot 13 is a disk-based boot program that allows a user to "boot" older versions of the Apple disk operating system when the user has a 16 sector boot ROM on the Controller Card.

### (12) MasterCreate

The MasterCreate program is a disk-based, operating systems program. When a floppy disk is first initialized, or formatted, the DOS 3.3 is placed on the disk in a form that is dependent on the amount of RAM available. The MasterCreate program replaces the DOS 3.3 on the disk with a version that is independent of the amount of RAM available.

### (13) Apple 13—Sector Boot ROM

The Apple 13—Sector Boot program is in a ROM located on the Disk Controller Card.

This boot program initializes numerous circuits in the Controller Card and in the Apple II computer and causes other parts of the disk operating system used for 13 sector formatted disks to load.

### (14) Apple 16—Sector Boot ROM

The Apple 16—Sector Boot program is in a ROM located on the Disk Controller Card. This program initializes numerous circuits on the Controller Card and in the Apple II computer and causes other parts of the disk operating system used for 16 sector formatted disks to load.

### III. Copyright Law

### A. The Source of Congressional Power

Congress takes its power in the area of copyright from Art. I, Sec. 8, cl. 8, of the Constitution ("To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries. . ."). From the start, Congress has divided the protection given to authors and inventors, established different criteria for protection, and provided different periods of protection. *Alfred Bell & Co. v. Catalda Fine Arts*, 191 F.2d 99, 100–101 (1951).

The division between the scope of copyright protection and patent protection has been recognized in Section 102 of the 1976 Copyright Law (hereinafter "the Act"). 17 U.S.C. § 102. Section 102(a) restates, with new flexibility, what has been the traditional area covered by copyright: to protect through limited monopoly original works of authorship[4] 17 U.S.C. § 102(a). Section 102(b), taken together with the Act's definitions, excludes those areas which, if they are to be protected, may be only through patent law.[5] 35 U.S.C. § 1, *et seq.* The

---

4.  Copyright protection subsists, in accordance with this title in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of

authorship include the following categories: (1) literary works. . .
17 U.S.C. § 102(a)

5.  Pictorial, graphic, and sculptural works . . . shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article . . . shall be con-

works in suit are such that they may arguably be entitled to copyright protection or patent protection, both forms of protection or neither. I am asked to consider the motion for preliminary injunction only from the point of view of copyright infringement, yet it is clear that Section 102 must be interpreted in terms of Congress' intent with regard to both copyright and patent, at least as patent law limits the scope of the 1976 Act.[6]

## B. The Divided Views of Others

The problems raised here stem from the fact that there is no clear consensus on how to describe the technology employed in microcomputers. With no clarity there, the application of law to fact becomes unsure. Plaintiff Apple's claim is based on the argument that 1) a computer's operating system is a form of expression, not an idea or process; 2) whether in ROM or on floppy disk, object code or an object program, containing code, is a form of expression and a work of authorship and 3) a ROM is a tangible medium of expression, not a mechanical device. Leaving aside the question of how to describe the computer's technology and the works in suit, plaintiff argues that it was the clear intent of Congress in the 1976 Act and its 1980 Amendment to the Act to protect all computer programs, in whatever form, as if they were a species of "literary works."

Opinion has been divided on how to treat object codes, on the nature of the authorship entailed, and on how to treat ROMs generally. The National Commission on New Technological Uses of Copyright Works (hereinafter "CONTU") was divided.[7] Judicial opinion has been mixed.[8] *See*

---

sidered a pictorial, graphic, or sculptural work only if ... [its] ... features ... can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101.

A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information ...

17 U.S.C. § 101.

In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b).

Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent.

35 U.S.C. § 101.

**6.** Plaintiff Apple, relying on *In re Yardley*, 493 F.2d 1389 (C.C.P.A.1974, contends that the scope of copyright is not limited by the scope of patent and that the same thing may receive both copyright and patent protection. I think that this contention is wrong and that plaintiff's reliance on *Yardley* is misplaced. The court in *Yardley*, following the Supreme Court in *Mazer v. Stein*, 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954), found that the 1909 Copyright Law and the 1952 Patent Law provided for overlapping protection. That analysis applied to this case and the 1976 Act begs the question. Section 102(b) explicitly removes from copyright protection "any idea, procedure, process,

system, method of operation ..." and section 101 explicitly excludes those works whose "mechanical or utilitarian" function cannot be separated from the work in which it adheres. 17 U.S.C. §§ 101 & 102(b). The test requires both "separability and independence from 'the utilitarian aspects of the article'" H.R.Rep.No. 1476, 94th Cong., 2nd Sess. 55 (1976), U.S.Code Cong. & Admin.News 1976, p. 5659. Neither Section 102(b) nor this test was in the 1909 Copyright Act. In argument, plaintiff has not distinguished the form of the work from its utilitarian purpose. In fact, by arguing that the works in suit are each "literary works" or forms of expression, plaintiff has suggested the opposite: that their function and form are merged because each work as a whole "convey[s] information." *See* definition of "useful article," 17 U.S.C. § 101, *supra* note 5.

**7.** CONTU was established in 1974 to make recommendations to Congress concerning the copyrightability of computer software and other associated programs; it submitted its Final Report in 1978. Final Report, National Commission on New Technological Uses of Copyrighted Works (1978) (hereinafter "Final Report"). The Final Report consisted of a majority statement and separate statements by Commissioner Nimmer (concurring), Commissioner Hersey (dissenting), and Commissioner Karpatkin (dissenting in support of Commissioner Hersey).

The majority in the Final Report appear to be definite in its attitude towards the copyrightability of computer programs. "Flow charts, sources codes, and object codes are works of authorship in which copyright subsists ..."

---

**8.** See note 8 on page 818.

Final Report 21. Nonetheless in another passage, the majority observed that "[c]opyright, therefore protects the program so long as it remains fixed in a tangible medium of expression but *does not protect the electro-mechanical functioning of a machine.*" *Id.* 20 (emphasis added). And again later, the majority commented that "[i]f it should prove possible to tap off these [electrical] impulses then, perhaps, the process would be all that was appropriated, and no infringement of the copyright would occur." *Id.* 22. The present case is, of course, focussed exactly on those issues the majority questioned. *See infra* notes 14–15 and accompanying text.

In its summary, CONTU made clear that it had not resolved the issues raised by programs encoded on a ROM.

> It is equally important to note that these recommendations do not deal with each and every technological issue affecting the interests of copyright users and owners. Specific topics may deserve congressional attention ... (2) protection for topography or layout of microcircuit chips.

> .    .    .    .    .

> The question of copyright protection for the topography of microcircuit chips was raised by a manufacturer of these devices too late to be dealt with adequately by the Commission.

*Id.* 79. *See infra* note 9 for discussion of subsequent congressional investigation of copyright protection for chip topography.

In his concurrence, Commissioner Nimmer suggested that CONTU had gone too far in its views of software copyright protection by extending protection to areas reserved for patent law or areas deliberately left unprotected. *Id.* 26.

> [I]t may prove desirable to limit copyright protection for software to those computer programs which produce works which themselves qualify for copyright protection. ... A program designed for a computer game would be copyrightable because the output would itself constitute an audiovisual work. On the other hand, programs which control the heating and air-conditioning in a building, or which determine the flow of fuel in an engine, or which control traffic signals would not be eligible for copyright because their operations do not result in copyrightable works ...

*Id.* 27. *See infra* text accompanying notes 18–19.

In his dissent, Commissioner Hersey noted the machine-control character of a computer program. He contended it was neither a "writing" nor a "literary work," since it had no communicative function. *Id.* 27–30. "Communication as we understand it ceases, and ... 'behavior'—an opening and closing of electronic gates—sets in." *Id.* 37. *See infra* note 14.

**8.** *Data Cash* is perhaps the most definitive trial court opinion holding that object code in ROM is not copyright protected. Its analysis of the function of object code is persuasive. However, its holding is somewhat weakened by the affirming opinion of the Court of Appeals since it may be read as suggesting that ROMs may be copyright protected if the copyright formalities have been satisfied. *See infra* text accompanying note 18.

In two other cases, a trial court, considering allegations of restraint of trade in the computer field, observed that copyright does not prevent others from copying the material embodiment of the source program that is found in the object program. *In re Data General Corp. Antitrust Litigation,* 490 F.Supp. 1089, 1113 (N.D. Calif.1980); *In re Data General Corp. Antitrust Litigation,* 529 F.Supp. 801, 816 (N.D.Calif. 1981). In a somewhat similar question to that raised here, the court in *Synercom Technology, Inc. v. University Computing Co.,* 462 F.Supp. 1003 (N.D.Tex.1978) held that computer input formats were not copyright protected. The court said that "the litmus seems to be whether the material proffered for copyright undertakes to express." *Id.* 1011. "Thus the issue is whether [defendant] copied expressed ideas or their expression." *Id.* 1012.

*Tandy Corp.* represents the opposite judicial point of view. The facts in *Tandy Corp.* are similar to this case, alleged infringement of ROM object program that consisted of the computer's operating system. Disagreeing with the decision in *Data Cash,* the court held that the program was a work of authorship and that a ROM is a tangible medium of expression under the Copyright Act. *See infra* text accompanying note 16. More recently in *GCA Corp. v. Chance, et al.* Civ. No. C–82–1062 (N.D.Calif. July 12, 1982), the court followed *Tandy,* holding that object code in a ROM was copyright protected since the source code was copyrighted. However, the court's rather terse analysis provides little guidance.

In the last year, a number of courts have held that a ROM-based object program used to create visual displays in arcade games is properly copyright protected. *Midway MFG. v. Artic International, Inc.,* 547 F.Supp. 999, 211 U.S. P.Q. 1152 (N.D.Ill.1982). *See infra* text accompanying notes 20–21. *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607 (7th Cir. 1982); *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852 (2d Cir. 1982); *Atari, Inc. v. Amusement World, Inc.* (D.Md. Nov. 27, 1981); *Midway Manufacturing Co. v. Drikschneider,* 543 F.Supp. 466 (D.Neb.1981); *Williams Electronics, Inc. v. Artic International, Inc.,* Civ. No. 81–1852 (D.N.J. June 24, 1981); *Cinematronics, Inc. v. K. Noma Enterprise Co.,* Civ. No. 81–439 (D.Ariz. May 22, 1981).

*Data Cash Systems, Inc. v. JS&A Group, Inc.*, 480 F.Supp. 1063 (N.D.Ill.1979), *aff'd on other grounds*, 628 F.2d 1038 (7th Cir. 1980); *Tandy Corp. v. Personal Micro Computers, Inc.*, 524 F.Supp. 171 (N.D.Cal. 1981).[9] The legislative history is unclear.[10] Commentators have arrived at different conclusions.[11]

Apple's position is not implausible. The program of an operating system is, quite

---

**9.** Congressional intent regarding the copyrightability of object codes and ROMs is not clear. The 1976 Act left intact the case law developed under the 1909 Act. 17 U.S.C. § 117 (1976). *See* H.R.Rep. 116. The 1980 Amendment to Title 17, P.L. 96–517, incorporated a definition of computer programs, 17 U.S.C. § 101 as amended, and excluded from copyright infringement some forms of copying and adaptation, 17 U.S.C. § 117 as amended. While commentators have been willing to interpret these amendments as extending absolute copyright protection to software, *see* Stern, *Another Look at Copyright Protection of Software* at 8 & n.7, the amendments and subsequent legislative discussions suggest a restrictive reading.

In April 1979, Congress held hearings to consider a bill amending the 1976 Act in order to provide copyright protection for imprinted design patterns on semiconductor chips. *Copyright Protection for Imprinted Design Patterns on Semiconductor Chips, 1979: Hearing on H.R. 1007 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary*, 96th Cong., 1st Sess. (1979) (hereinafter "Hearing on Chips") (not reported out of committee). The question facing the committee was whether chips or integrated circuits are appropriately protected and, if not protected, whether copyright protection should be extended to them through legislation. "In the judgment and practice of the Copyright Office, the configuration of the chip is not [copyrightable]—if you were to depict these patterns on an earlier piece of paper we believe that piece of paper and the drawing is copyrighted, but there are limitations on the rights extended thereby." Hearing on Chips 21 (statement by Jon Baumgarten, at that time General Counsel for the U. S. Copyright Office). "[I]t's a question of whether the drawing and the chip are the same thing." *Id.* 21. *See infra* note 10.

A recent House staff report indicated that the debate continues. "The current methods available for protecting software are patents, copyright, and trade secret law. However the determination of the best alternative is still under debate. The issue of software protection reflects the problems associated with applying old legal tools to new technologies." Staff Report of the House Comm. on Science and Technology, Survey of Science and Technology Issues-Present and Future, 97th Cong., 1st Sess. 69 (1981). "The underlying issue is whether new forms of statutory protection are necessary to insure the continued development of computer software. Congress may wish to consider whether current efforts such as those to amend the Copyright Act of 1976, are sufficient to protect new technologies or whether additional measures should be undertaken. Congress may wish to closely monitor decisions by the Supreme Court in this area in order to assess the need for legislative action." *Id.* 70.

**10.** Litigation reflects conflict. The recent increase generally in litigation of the kind represented by this case reflects an increased conflict in the applicability of the copyright law to ROMs and object codes. *See supra* note 8. *See also Getting Tough on Software Theft*, Business Week, 28–29 (May 31, 1982). As one might suspect by the increased litigation, members of the industry appear not to agree on whether the current law covers works like those in suit. Testimony at the Hearing on Chips reveals the division, *see supra* note 9: testimony of L. J. Sevin, president, Mostek Corp. in favor, Hearing on Chips 22–31; testimony of Andrew S. Grove, president, Intel Corp., in favor, *Id.* 31–41; testimony of Professor James B. Angell, Stanford University, in favor, *Id.* 47–50; testimony of John Finch, vice president, National Semiconductor Corp., against, *Id.* 50–55; testimony of James M. Early, director, Fairchild Camera & Instrument Corp., against, *Id.* 35–62. The arguments are interesting and go to the heart of policy questions related to the protection and promotion of this technology. But it is sufficient to say that among this group there was agreement that the copyright law does not clearly protect work like those in suit that are ROM-based.

**11.** *See generally* ABA Subcomm. on Copyright Protection for Video Displays, Discussion, Reports to Annual Meeting 162 (1982); L. Gasaway & M. Murphy, Legal Protection for Computer Programs (1980); Rose, *Intellectual Property Rights*, 9 Pepperdine L.Rev. 547 (1982); Stern, *Roms in Search of a Remedy*, 1 Computer Law Reporter (1982); Schmidt, *Legal Proprietary Interests in Computer Programs*, 21 Jurimetrics J. 345 (1981); Davidson & Russo, *Protection of Computer Software After the Copyright Act of 1980* in Computer Programs & Data Bases 119 (1981); Keplinger, *Protection of Computer Software*, 30 Emory L.J. 483 (1981); Stern, *Another Look at Copyright Protection of Software: Did the 1980 Act do Anything for Object Code?*, 3 Computer/Law J. 1 (1981); Iskrant, *The Impact of the Multiple Forms of Computer Programs on Their Adequate Protection by Copyright*, 18 Copyright L.Symp. (ASCAP) 92 (1968).

conceivably, the expression of an original work that is fixed in the tangible medium of the written program or fixed in the medium that stores it, whether it be disk or ROM. Object code may be said to be the language used by a programmer in the same way Hemingway may be said to have used English to write *For Whom the Bell Tolls*. A ROM may be considered a "tangible medium of expression," fixing an original work much as a book, record or motion picture film fix a literary work, a musical work or a motion picture.[12]  17 U.S.C. § 102(a).

## C. Case Law and Copyright Law

All the analysis of the facts in this case depends upon the meaning given to the key words of art used in the Act and defined by the courts. They are: "creativity and originality," "expression and ideas," and "works of authorship".

### (1) *"Creativity and Originality"*

From the outset, it is important to recognize that the issues raised here cannot be resolved on the grounds of creativity—the presence or absence of it. Copyright law does not require that the author or artist be exceptionally creative or original. In fact, "a modicum of creativity may suffice for a work to be protected." *Universal Athletic Sales Co. v. Salkeld*, 511 F.2d 904, 908 (3rd Cir.), *cert. denied* 423 U.S. 863, 96 S.Ct. 122, 46 L.Ed.2d 92 (1975). Alternatively, extreme creativity does not in itself make an argument for copyrightability. At issue is only whether the works in suit are the

"fixed" expression of an author's "original work." [13]

Nevertheless, "[i]t is possible to have an 'original work of authorship' without having a 'copy' embodying it, and it is also possible to have a 'copy' embodying something that does not qualify as an 'original work of authorship.'" H.R.Rep. 53. Although there can be a variety of different material embodiments of the work, there can be only one original work.

In the case of computer programs, like those in suit, one must be able to identify the original work that has been embodied. It is not clear whether the program-designer's idea of the operating system program, the source program, or the ROM is the "original work of authorship." It is not surprising that this should be hard to determine, because at each stage major transformations in the structure of the "program" take place. From plaintiff's point of view, the best argument is that the idea of the operating system is the "original work" and that all that follows are copies. The counter-argument that plaintiff must respond to is a technical one that goes to the heart of the technology: in the case of the programs on ROM did the programmer-designer imagine the architectural structure of the ROM, the overlay of micro-switches that would be most economical and efficient for the system, or did he envision the flow chart of operations which the program would perform? If the former, the programmer may be said to have been an

---

12. Under this definition "copies" and "phonorecords" together will comprise all of the material objects in which copyrightable works are capable of being fixed. The definitions of these terms in section 101 [17 U.S.C. § 101], together with their usage in section 102 [17 U.S.C. § 102] and throughout the bill, reflect a fundamental distinction between the "original work" which is the product of "authorship" and the multitude of material objects in which it can be embodied. Thus, in the sense of the bill, a "book" is not a work of authorship, but is a particular kind of "copy." Instead, the author may write a "literary work," which in turn can be embodied in a wide range of "copies" and "phonorecords," including books, periodicals, computer punch cards, microfilm, tape recordings, and so forth....

H.R.Rep. 53. Section 101, 17 U.S.C., defines "copies" as "material objects ... in which a work is fixed by any method now known or later *developed ... from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.*" (emphasis added). *See infra* note 21 and accompanying text.

13. A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.

17 U.S.C. § 101.

engineer designing a utilitarian aspect of the machine. If the latter, the programmer may not be said to have designed the architecture of the chip. *See infra* note 14 and accompanying text.

Apple's argument that its programmers displayed virtuoso skill, if not genius, in developing the programs and the ROMs is not dispositive, even though I tend to agree that the evidence demonstrates their extraordinary skill. In the context of the Copyright Act, an "original" work need not be a work of genius.

### (2) *"Expression and Ideas"*

The distinction between ideas and expression, while not always self-evident, is crucial. An "expression" may, under some circumstances, be said to be the tangible, fixed form of an idea where the expression's purpose is "to convey information." 17 U.S.C. § 101. Such a statutory reading is consistent with both the Act's legislative history, H.R.Rep. 52–53, and case law. Any tangible form can be treated as the constitutional equivalent of "writings," *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S.Ct. 279, 281, 28 L.Ed. 349 (1884), which are the classic, permanent medium for conveying information and transmitting ideas.

Enlarged as the concept of "writings" now is, it retains its original meaning: to express and communicate. *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1879), made the first, and still most notable, statement of this proposition. "The description of the art in a book, though entitled to the benefit of copyright, lays no foundation for an exclusive claim to the art itself. *The object of one is explanation; the object of the other is use. Id.* 105 (an accounting form held not copyrightable, but the explanation of the form was) (emphasis added).

Admittedly, the holding in *Baker* has been somewhat limited after *Mazer v. Stein, see supra* note 6, *see also* 1 Nimmer on Copyright, § 2.18[C], but the underlying

perception still retains its vitality. The balance *Baker* presented between "explanation" and "use" is the balance between the material meant to be protected by the copyright clause of the Constitution and that meant to be protected by the patent clause. *Accord Taylor Instrument Companies v. Fawley-Brost Co.*, 139 F.2d 98, 99 (10th Cir. 1943). Following *Baker*, the court in *Taylor* drew the distinction between copyright and patent as between that which "teaches . . . [and] explains the use of the art" and that which "is an essential element of the machine." *Id.* 100. The vitality of *Baker* is found in the distinctions drawn between Section 102(a) and Section 102(b) in the Act, between that work "fixed in a tangible medium of expression" and that which has its primary function the exploitation or use of an idea. *See* H.R.Rep. 56–57.

It is not clear in this case that an operating system in binary code or one represented either in a ROM or by micro-switches are "explanations" under the *Baker-Taylor* doctrine. Equally, it is not clear that object code, which was not designed to be "read" by a human reader and can only be read by an expert with a microscope and patience, is a language of description. It cannot teach. It can be used to control the operation of the computer. For these reasons, it may be more accurate to say that operating systems are an essential element of the machine, if not an essential part of the machine that makes it work. Similarly, it may be more accurate to say that object code in its binary form or chip form is a useful version of the machine's electrical pulse.

### (3) *"Works of Authorship"*

Copyright protection subsists only in original works of authorship. 17 U.S.C. § 102(a). Working directly in object code, the programmer appears to think in the manner of a mathematician or engineer, who solves explicit problems that have defined parameters.[14] While it is tempting to treat all computer programs as "literary

---

**14.** At the level of the microcode, physical and abstract meet. The microcode controls the actual circuits . . . . Indeed, the physical machine responds only to microcode. It was microcode, at bottom, that caused [the computer] to translate [the division symbol] into microcode. In this sense, the computer chases its tail . . . . Writing microcode, however,

works," such an analysis may only serve to confuse the meaning of authorship.

The process of constructing a chip is "not so much a work of authorship as the product of engineering knowledge (often skillful and sometimes creative) focused on obtaining a desired function or output. Accordingly, ... the resulting integrated circuit represent[s] the function desired in the circuit rather than an effort of the type exerted by authors." Hearing on Chips 59 (statement of James Early on behalf of Fairchild Camera & Instrument Corp.). *See supra* note 9. Hence, it may be more apt to describe an encoded ROM as a pictorial three-dimensional object than as a literary work and to discount the notion of authorship associated with literary or creative works.

Programmers need not write in object code and, most do not, because the computer can make its own "translation" of object code from an original source code.[15] Because this is so, it is argued that the "automatic" translation of source to object code establishes a predictable one-to-one relationship between the two codes that preserves the programmer's original force of authorship. *See GCA Corp. v. Chance, et*

*al.*, Civ. No. C–82–1062 (N.D.Calif. July 19, 1982). *But see* Stern, *Another Look at Copyright Protection of Software*, 3 Computer/Law J. 1, 3 (1981).

The reasoning that finds object code a derivative work of source code and thus copyrightable, 17 U.S.C. § 103(a), follows somewhat Judge Hand's in *Reiss v. National Quotation Bureau, Inc.*, 276 F. 717 (S.D. N.Y.1921) (meaningless code words were copyright protected). *See* CONTU, Final Report 14–15. According to this reasoning, the programmer meets the standard of authorship when he has created expressions even if the computer is to supply its own "meaning" and its own use. "I can see no reason why [the code] words should not be [writings] because they communicate nothing. They may have their uses for all that, aesthetic or practical, and they may be the production of high ingenuity, or even genius." *Reiss*, 276 F. at 719. *See* Iskrant, *The Impact of Multiple Forms of Computer Programs* 118.

### D. The ROM as Three-Dimensional, Pictorial, Graphic or Sculptural Work

It is precisely the problem of description that makes this problem so baffling. The

---

is no simple task. The code is by definition intricate. To make the machine execute just one of its two hundred or three hundred basic instructions, the coder usually has to *plan the passage of hundreds of signals through hundreds of gates.* Limited storage space forces the coder to economize—to make one microinstruction accomplish more than one task, for example. At the same time, though, the coder must take care that one microinstruction does not foul up the performance of another.

   .    .    .    .    .

Writing microcode is like nothing else in my life. For days there's nothing coming out.... [F]inally I get into a mental state where I'm *a microcode-writing machine....* You have to understand the program thoroughly and you have to have thought of all the myriad ways in which you can put your microverbs together. You have a hundred L-shaped blocks to build a building. You take all the pieces, put them together, pull them apart, put them together. After a while, you're like a kid on a jungle gym. There are all these constructs in your mind and you can swing from one to the other with ease.

T. Kidder, The Soul of a New Machine, 97–102 (1981) (quoting program designer) (emphasis added).

**15.** Programs written in source codes are generally conceded to be copyrightable. *See* Keplinger, *Protection of Computer Software* 510; Stern, *Another Look at Copyright Protection of Software* 4; *Synercom* at 1013n.5.

Source codes are mnemonic systems of abbreviating machine instructions. "Typical abbreviations might be HLT for "halt," STA for "store in register A," BR + for "branch if the register is plus," XZJ for "jump if index register is zero." Iskrant, *The Impact of the Multiple Forms of Computer Programs*, 18 Copyright L. Symp. (ASCAP) 92, 105 (1968). Source programs are placed in the computer through the keyboard, by disk, tape or cards and, then, are converted by the machine into an intermediate assembly language and finally into object code. *See* T. Kidder, The Soul of a New Machine 97–99. Although programmers normally write in source code because it can easily be read and corrected, programmers may write directly in object code when it is necessary to have direct control over the architecture of the ROM. *See supra* note 14.

list of comparisons, thanks to ingenious counsel, is a long one; equally good analogies lead to contradicting results.

ROMs which have interiors etched or designed to incorporate object code in their physical shape may be likened to three-dimensional works of art, *Mazer v. Stein*, 347 U.S. at 210–215, 74 S.Ct. at 466–469, and therefore be entitled to copyright protection. *See supra* note 5.

In *Taney Corp. v. Personal Micro Computers, Inc.*, the court viewed an encoded ROM as being somewhat akin to a three-dimensional object that may not be copied by a non-copyrightholder without infringing on the copyright. *Id.* 173, 175. In this light, a ROM is taken to be a self-contained and clearly fixed form of expression since "*duplication* of a chip is not the use of a copyrighted program 'in conjunction with' a computer; it is simply the copying of a chip." *Id.* 175. This analysis contradicts somewhat the view of the CONTU majority that a "tapped off" ROM may not be protected from copyright infringement.[16]

On the other hand, ROMs encoded with an object program may be compared to a physical structure with an essentially useful purpose or function, like that of a bridge, *Muller v. Triborough Bridge Authority*, 43 F.Supp. 298, 299 (S.D.N.Y.1942), or to an architectural work like a house, *De Silva Construction Corp. v. Herrald*, 213 F.Supp. 184, 195–196 (M.D.Fla.1952). As such, an object program encoded on a ROM would not be entitled to copyright protection.[17] In *De Silva Construction Corp.*, the court went further: the construction of a building by the copyrightholder does not amount to publication of the plans. *Id.* 196. Plans are different from the building based upon the plans.

It is possible that this is the situation in the current dispute: neither the Apple nor Franklin ROM is a copy of an "original work" since the plan upon which each is based may be considered to exist separately from the chip that is ultimately constructed. Absent copying, there is no infringement of copyright. *Mazer v. Stein*, 347 U.S. at 218, 74 S.Ct. at 471.

The issue here is, of course, whether the ROM structured with code is a new entity created through the use of the plans, *i.e.*, the program, or whether it incorporates the plan or program in its own structure. If the former, under the reasoning of *De Silva Construction Corp.*, it would not be entitled to copyright protection. If the latter, it might be entitled to protection. But even here, the protection might only extend to the ROM with its interior. It would not cover the object code by itself.

E. The Expression of a Utilitarian Function

Defendants argue that the programmed ROM is an object that merges idea and expression to the point they are indistinguishable, *see Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971), or merges its utilitarian function and expressive purpose so that they too are inseparable, *see Esquire, Inc. v. Ringer*, 591 F.2d 796, 798–800 (D.C.Cir.1978), *cert. denied* 440 U.S. 908, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979). It is this inseparability of function and purpose that the court in *Data Cash* found, where it was held that the ROM at issue was not copyrightable.[18]

The copyright protection available to a ROM is similarly restricted if the ROM is defined as a mechanical device. "In its object phase, the computer program is a mechanical device which is engaged in the computer to become an essential part of the mechanical process." Keplinger, *Computer Intellectual Property Claims*, 1977 Wash. L.Q. 461, 464 (quoted with approval in *Data Cash*, 480 F.Supp. at 1067n.4(2). *See also* Stern, *Another Look at Copyright Protection*, 3 Computer/Law J. at 2. *See generally* D. Fink, *Computers and the Human Mind* at 131–177. If a ROM is found to be a

---

16. *See supra* note 7. *See also* Stern, *Roms in Search of a Remedy*, 1 Computer Law Rep. (1982).

17. *See also Data Cash*, 480 F.Supp. at 1068.

18. *See supra* note 8.

mechanical device, it loses the protection reserved for writings and expression under copyright. 1 Nimmer on Copyright § 2.18[4] (1979) (quoted with approval in *Data Cash*, 480 F.Supp. at 1067n.4(2). The argument that a ROM is a mechanical device has been made:

Descriptions and printed instructions tell human beings how to use material or machinery to produce desired results. In the case of computer programs [on the other hand], *the instructions themselves eventually become an essential part of the machinery that produces the results.* They become (in chip or hardware form) a permanent part of the actual machinery.... This is a device capable of commanding a series of impulses which open and close the electronic gates of the computer in such order as to produce the desired result.

CONTU, Final Report 28 (Commissioner Hersey dissenting) (emphasis in original).[19] Commissioner Hersey observes that the appropriate analogy to describe a program within the computer is that of a "cam" which, "like a mature computer program, is the objectification of a series of instructions." *Id.* 29–30. While either the cam or the machine-language or binary code may be read by an expert, its purpose is not to serve as a form of human communication. As he wrote, echoing the *Baker-Taylor* doctrine, "[p]rinted instructions explain *how* to do something; programs are *able* to do it." *Id.* 28 (emphasis in original).

The argument made by Commissioner Hersey and by defendant Franklin that the ROM is a mechanical device is an argument for its patentability. *See supra* note 6. A ROM may be characterized as firmware, a combination of software and hardware that operates together to control a computer. Certain firmware is protectable under patent law. *Diamond v. Bradley*, 450 U.S. 381, 101 S.Ct. 1495, 67 L.Ed.2d 311 (1981) (per curiam), *aff'g by an equally divided court In re Bradley*, 600 F.2d 807 (Cust. & Pat. App.1979).

The argument for the patentability of the various operating systems in suit may also rest on the view that they are manifestations and implementations of the "useful arts," as the term is understood in patent law, directed to producing a beneficial result. *Diamond v. Diehr*, 450 U.S. 175, 182–183 & n.7, 100 S.Ct. 1048, 1054 & n.7, 67 L.Ed.2d 155 (1981). A computer's operating system is, by this view, the means by which a computer is "transformed and reduced to a different state or thing," *Cochrane v. Deener*, 94 U.S. 780, 788, 24 L.Ed. 139 (1877); *accord Diamond v. Diehr*, 450 U.S. at 183, 100 S.Ct. at 1054, although it would have to be shown that its transformed state is specialized and distinct from that of other machines of the same class. I do not, of course, conclude that Apple will be able to satisfy the rather rigorous tests of the patent law.

## F. The Test of Communication for Copyright

The *Baker-Taylor* doctrine suggests that the scope of copyright is limited to material that can claim an underlying expressive or communicative purpose. It is a test not easily applied because it raises questions at the very heart of all discussions on the purpose and meaning of language. It is a test not easily satisfied by works, like those in this suit, that are in the form of binary code and electro-mechanical chips.

Perhaps it is sufficient to say in the context of the present motion for preliminary injunction that no matter how indirect or exotic the form of expression or the medium used, the question must be: is the expression directed to a human audience?

A recent case like *Midway Mfg. Co. v. Artic International, Inc.*, 547 F.Supp. 999, 211 U.S.P.Q. 1152 (N.D.Ill.1982) (ROM containing the code for a visual display held copyrightable) reveals the complexity of the question presented by the present case and the fragile but important distinctions that must be made when considering the copy-

**19.** *See supra* note 7.

rightability of object codes.[20] In *Midway*, the object code was the underlying system used by the computer to produce a series of visual images that were meant to be perceived by an arcade game player.

Restricted to these facts, it is not illogical to treat the object code as an "expression . . . which can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[21] 17 U.S.C. § 102(a). The "original work" is the visual display that has been fixed, presumably, first in source code and later in object code. No matter how it has been fixed, its purpose from the outset was to generate an image that could be *perceived* and its goal was to attract and engage a human audience. Such purposes and goals satisfy our conventional expectations of expression.

If the concept of "language" means anything, it means an ability to create human interaction. It is the fixed expression of this that the copyright law protects, and only this. To go beyond the bounds of this protection would be ultimately to provide copyright protection to the programs created by a computer to run other computers. With that, we step into the world of Gulliver where horses are "human" because they speak a language that sounds remarkably like the one humans use. It is an intriguing analogy but false. The logic of the court in *Midway* does not resolve the problem raised in this case.

**20.** *See supra* note 8.

**21.** It does not distort this phrase to understand it as requiring that the work be perceptible to a human audience and not merely perceptible to a machine. Its plain meaning suggests that machine aid is recognized in this section only if it is capable of aiding human perception and supporting human communication. A similar construction is used in Section 401, "notice of copyright: Visually perceptible copies." It would indeed be a curious interpretation of Section 401 if it were to be read as referring to anything but a copy that can be humanly perceived.

. . . [A] notice of copyright as provided by this section shall be placed on all *publicly distributed copies from which the work can*

## IV. Conclusions

The requirements for issuing a preliminary injunction are well known. Plaintiff must show:

1. A reasonable probability of success on the merits;

2. Irreparable injury to the plaintiff that exceeds any injury to the enjoined defendant;

3. The improbability of harm to other interested persons; and,

4. A public interest that would be furthered.

*Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–920 (3rd Cir. 1974).

There is limited evidence as to the last two showings, but, as the foregoing memorandum should make clear, I have considerable doubt about Apple's likelihood of success on the merits. While Apple's arguments are strong, I do not believe that it has shown a reasonable *probability* of success. It is also clear that Apple is better suited to withstand whatever injury it might sustain during litigation than is Franklin to withstand the effects of a preliminary injunction. While I am not prepared to find that the injunction sought by Apple would force Franklin out of business, it would certainly have a devastating effect.

Apple having failed to make the necessary showing, its motion will be denied.

*be visually perceived*, either directly or with the aid of a machine or device.
17 U.S.C. § 401. (emphasis added). *See also* Regulations, Office of Copyright.
[T]he Copyright Office will consider registration for a "book" . . . if . . .
(2) The program has been published, with the required copyright notice; that is, *"copies" (i.e., reproductions of the program in a form perceptible or capable of being made perceptible to the human eye) bearing the notice have been distributed or made available to the public.*
Office of the Register of Copyrights, Announcement SML–47 (May 1964); Copyright Office Circular 310 (Jan. 1965).