**APPLE COMPUTER, INC., a California corporation, Plaintiff,**

v.

**FORMULA INTERNATIONAL, INC., a California corporation, Defendant.**

**No. CV82–5015–IH.**

United States District Court, C.D. California.

April 25, 1983.

Brown & Bain by Jack E. Brown, Phoenix, Ariz., Lois W. Abraham, Palo Alto, Cal., and Blakely, Sokoloff, Taylor & Zafman by Edwin H. Taylor, Beverly Hills, Cal., for plaintiff.

Thomas E. Schatzel by Bruce G. Spicer, Santa Clara, Cal., for defendant.

## OPINION

IRVING HILL, District Judge.

Before the Court is Plaintiff's motion for preliminary injunction filed September 27, 1982. The motion was argued on December 20, 1982.

In announcing its decision on the motion, the Court is making certain findings of fact and formulating certain conclusions of law. These are based only on the evidence now before the Court in connection with the motion and the Points and Authorities that have been submitted up to this time. These findings and conclusions are made without prejudice to those which the Court will be required to make on the same issues after the trial of the matter on the merits.

## I. THE PARTIES AND THE PRODUCTS THEY MAKE AND SELL

Plaintiff Apple Computer, Inc., manufactures and sells computers and related peripheral equipment, including computer programs and other software for computers. Though established only in 1976, Apple has become a giant concern selling its products worldwide. Its gross sales are in the hundreds of millions of dollars annually. Among Apple's principal products is the Apple II computer, a small computer designed primarily for personal use in the home or in the office of a small business. Apple also makes a wide variety of peripheral equipment for compatible use with the Apple II computer. Among such items are diskettes.

The Apple II computer contains a number of computer programs embodied in ROMs. The Apple diskettes also contain computer programs embodied therein. Five Apple computer programs are in issue in this case. Two of these, "Autostart" and "Applesoft" are embodied in ROMs. The other three programs, "HELLO", "DOS 3.3" and "Apple Integer BASIC" are embodied in diskettes. All five programs have been registered under the Federal Copyright Act.

The ROMs in issue in this case have a copyright notice either printed on the ROM

itself or printed immediately next to the ROM on the circuit board to which the ROM is affixed. Each diskette in issue in this case bears a copyright notice on its face.

The terms ROMs, diskettes and some of the other terms which have been used will shortly be defined.

The Defendant, Formula International, Inc., operates a single large electronics supply store selling at retail and wholesale. Its major business is the sale of electrical components of various kinds. Formula apparently does not itself manufacture any of the components it sells. To this point, Formula's revenues from the sale of computer products constitute only a small percentage of its total sales.

Up to now, Formula has sold no assembled computers. In May of 1982, Formula commenced the sale of a computer kit under the trade mark "Pineapple". When assembled, the materials contained in the kit make up a computer which is, like the Apple II, designed for personal use in the home or in small businesses. The assembled Pineapple computer in external appearance is virtually indistinguishable from the appearance of the Apple II counterpart and its uses and capacities are very similar if not identical. Formula, in addition, sells equipment for personal computers, some of which is identical to that which Apple sells.

Apple has presented evidence that Formula's kit and its peripheral equipment contain computer programs embodied in ROMs and diskettes which are virtually identical copies of the above mentioned computer programs embodied in Apple's ROMs and diskettes. This factual claim is not disputed. Formula claims no copyright on any of its computer programs. Formula's kits are assembled by apparently independent concerns in Taiwan and Hong Kong. Formula acknowledges that at least some of these concerns make the kits and components according to Formula's instructions and specifications.

As of the time Formula filed its response to Apple's motion for a preliminary injunction, Formula had sold only 49 Pineapple kits. The sale of these kits has now been discontinued. Formula, however, is advertising and offering for sale, a new type of Pineapple kit. From it, there can be assembled a personal computer with the same capacities and computer programs as are found in its previous model and in the Apple II. But its exterior is somewhat less like the present Apple II exterior.

## II. THE COMPLAINT

Apple sues Formula on three separate theories, copyright infringement, trademark infringement and unfair competition. Apple charges that Formula violates its copyrights on the various computer programs embodied in the Apple ROMs and diskettes.

Apple has five trademarks embodying the "Apple" name as used on various computers, computer equipment and computer programs. Apple accuses Formula of infringing each of its registered trademarks by adoption of the "Pineapple" name. Formula does not claim any federal trademark registration of its "Pineapple" name.

The unfair competition charge is centered on (1) alleged misappropriation of the fruit of Apple's efforts in developing an integral computer component called a "Mother Board" and (2) alleged palming off resulting from the use of similar names in marketing.

The complaint also charges Formula with infringement of two of Apple's patents but that claim is irrelevant to the present motion. The request for preliminary injunction is not in any way based on alleged patent infringements.

## III. THE REQUESTED PRELIMINARY INJUNCTION

Apple's motion asks the Court, pending trial of the case, to enjoin Formula from:

(1) Manufacturing, importing, distributing or selling the Pineapple computer either in assembled or kit form,

(2) Using a case which copies or imitates the configuration of the Apple II computer case,

(3) Using the mark or name Pineapple or any other colorable imitation of the Apple trademark or trade name and

(4) Distributing or selling any items which are, or include, copies of the computer programs copyrighted by Apple including the Autostart, Applesoft, HELLO, DOS 3.3 and Apple Integer BASIC.

Plaintiff says that all of said computer programs are fixed on ROMs or diskettes.

It is appropriate now to describe each of those latter items.

ROM is an acronym for Read Only Memory. A ROM is a photochemically imprinted silicon chip which stores information in the form of minute "bits". Bits are simply on-and-off switches. The pattern, sequence and frequency with which these switches are activated gives instructions to the machine and causes it to function in its various modes. The entire pattern imprinted on a ROM makes up what is generically called computer programs.

To manufacture a ROM or diskette containing an original computer program, one must write out the program in graphic form (e.g., flow charts) or in "source code" (generally a high level computer language which can be understood by humans). The graphic rendition or source code is itself copyrightable. If flow charts are used, they are reduced to source code by the programmer. The source code form is often translated into letters, numbers, and symbols sometimes called assembly language. Then the source code or assembly language is finally translated to what is called "object code" which is machine language useable by the machine. Then, as a final step, the object code is imprinted onto the silicon chip or diskette by photochemical process or electrically. Apple represents that the programs involved here have been copyrighted and published in various forms, in either source or object code versions, or both. The extent of copyright protection afforded to a computer program does not appear to depend on the form in which it has been copyrighted, and neither party in this case contends that it does.

"Autostart" identifies a particular program on an Apple ROM. "Applesoft" identifies a different Apple program on a ROM. DOS 3.3, HELLO and Apple Integer BASIC are different computer programs which Apple sells on diskettes. A technical description of each program is contained in *Apple Computer, Inc., v. Franklin Computer Corp.,* 545 F.Supp. 812, 815 (E.D.Pa.1982), which is adopted here by reference.

The Court will enjoin Defendant, pending trial, from using as a trademark or trade name, the name "Pineapple" or any other name embodying the word or term "Apple" or otherwise confusingly similar to the trademarks of Plaintiff. However, the said injunction will not include a restraint on the Defendant as to the shape or configuration of the container or box in which its computer, or a computer made from its kit parts, is contained.

A preliminary injunction is also granted to Plaintiff as prayed which will enjoin Formula, pending trial, from distributing or selling any items which are, or include, copies of Apple's copyrighted computer programs, namely, Autostart, Applesoft, HELLO, DOS 3.3 or Apple Integer BASIC. The injunction is based on a finding that Plaintiff's evidence demonstrates sufficient probability of success in proving actionable infringements of Plaintiff's copyrights on those computer programs.

In reaching these decisions, the Court has taken into account the standard for the grant or denial of preliminary injunction which governs in the Ninth Circuit. This will be discussed in more detail later.

## IV. DISCUSSION OF THE COPYRIGHT LAW

Before beginning a detailed legal discussion of the copyrightability of computer programs, the record should note certain concessions which have been made in this case. Defendants concede a number of propositions which have been litigated by previous Defendants in copyright litigation involving computer programs. Formula does not dispute the following propositions:

1. The programs in issue, in the language of 17 U.S.C. § 102(a), are "fixed in a tangible medium of expression".

2. Converting a program from a source code into object code does not deprive the program of copyright protectability if it was previously protectible.

3. Some computer programs are validly copyrightable, i.e., those which contain expression. (Those which are not copyrightable, say Defendants, are those integral to the operation of the machine which do not directly produce visual communication with the user of the machine. All five items in issue are of the latter type.)

■ Thus the primary copyright law issue in the case is whether all computer programs, or only limited types of computer programs, are validly copyrightable.

### (A) *The Copyright Act Itself:*

Before 1976, it was unclear whether computer programs of any type were covered within the scope of copyright protection. Under previous statutes, including the Copyright Law of 1909, protection was extended only to "copies which were perceptible to humans—things written or printed ... in intelligible notation", as the Supreme Court put it in *White-Smith v. Apollo Company*, 209 U.S. 1, 17, 28 S.Ct. 319, 323, 52 L.Ed. 655 (1908). Eventually some computer programs, in the form of readable printouts, were accepted for copyright. But the legal protection afforded even such program printouts was in question. There were court decisions pointing both ways. Law review articles advanced spirited arguments. Even where it was thought the printouts were protected, it was uncertain whether such a copyright protected the program in any other form, e.g., in object code, on a ROM, or in other forms directly useable by a computer.

The 1976 Copyright Act, 17 U.S.C. § 101 *et seq.,* greatly broadened the scope of copyright protection in many areas. It rephrased some important language, and used significant new language in defining what could be protected. Among the new language was § 102(a) which provides that protection will be afforded to "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."

Section 101 in the 1976 revision further provided a specific definition to an important term used in § 102(a), *supra,* i.e., "fixed in any tangible medium of expression." Section 101 now provides "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy ... is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."

These statutory expansions would have resolved a great deal of doubt on coverage of computer programs at that point were it not for 17 U.S.C. § 117, also passed as part of the 1976 Act. Section 117 specifically preserved the preexisting state of the law as to copyrightability of computer programs without clearly defining what the preexisting law was. The status quo was preserved pending further study and later decision by Congress.

Congress made the decision in 1980. In that year Congress repealed and deleted § 117. (It inserted some new language not relevant to the present problem as a new § 117.) It also added a broad definition of "computer program" to 17 U.S.C. § 101.

Since these statutory amendments in 1980 the courts have held that computer programs are "works of authorship" and that a chip or ROM is a "tangible means of expression" of the said work of authorship. *Tandy Corp. v. Personal Micro Computers, Inc.,* 524 F.Supp. 171 (N.D.Cal.1981). The courts have likewise held that a program imprinted on a ROM is "fixed in a tangible medium," *Stern Electronics, Inc. v. Kaufman,* 669 F.2d 852 (2nd Cir.1982), and that the expression of a program in source code or object code is protected as a "copy", *Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870 (3rd Cir.1982);

*GCA Corp. v. Chance,* No. C82–1063 MHP (N.D.Cal.1982); *Hubco Data Products Corp. v. Management Assistance, Inc.,* No. 81–1295 (D.Idaho, Feb. 3, 1983).

As the Third Circuit has said, "the copyrightability of computer programs [was] firmly established after the 1980 amendment to the Copyright Act . . . ." *Williams Electronics, supra,* 685 F.2d at 975.

Defendants in this case expressly concede the authority of all of the cases above, for the points cited. Their legal theory proposes to draw a somewhat narrower distinction. They argue only that certain limited *kinds* of computer programs, whether fixed in ROMs or diskettes or in any form, are not copyrightable. They would have the Court exclude from copyrightability computer programs which are, as Defendants put it, "operating" programs, programs which are designed and intended to be used to control computer operations and do not directly produce the visual image or "expression" which the computer user discerns.

In advancing this argument, Defendants rely almost entirely on the language of § 102(b) of the Copyright Act which was inserted in the Act in 1976. Section 102(b) provides:

> "In no case does copyright protection for an original work of authorship extend to any <u>idea</u>, <u>procedure</u>, <u>system</u>, <u>method of operation</u>, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."

(Underscoring supplied).

In my view, Defendants misconstrue the purpose and effect of the section. It seems clear to me that the purpose of § 102(b) is to distinguish copyrightability from patentability. In fact, the Committee Notes which accompany the section as printed in United States Code Annotated say:

> "Sec. 102(b) . . . in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate, in the context of the new single federal system of copyright, that the basic dichotomy between expression and idea remains unchanged."

Without any express court authority except for one District Court case, Defendants argue that an operating computer program is an "idea" or a "procedure" or a "system" or a "method of operation" within § 102(b). To prove their argument, they submit bits and pieces from the depositions of Apple's employees and other experts wherein the deponents use one or more of these terms or similar characterizations in describing such programs. It is obvious that such casual word-use in the course of a lengthy deposition was not intended by the deponents to be a precise or legal definition of the function and purpose of the computer program in question and the excerpts are taken out of context. No real significance can be attached to these deposition quotations.

Defendants also rely on a very old Supreme Court decision, *Baker v. Selden,* 101 U.S. 99, 25 L.Ed. 841 (1879), which enunciates a difference between "expression" and "use". That case, and particularly the distinctions which the opinion draws between those terms, is simply no authority for the proposition which Defendants advance. Essentially, *all* computer programs as embodied in ROMs and diskettes are designed to operate a machine in such a way as to ultimately produce some useful communication to the user—that is their purpose. It is difficult to understand how they can be classified into two categories for copyright purposes, with protection afforded to one category and not the other, based on whether they directly generate that communication or whether they merely direct certain machine functions which eventually result in that expression. Either all computer programs so embodied are within the terms "idea, procedure, system, method of operation" and are excluded, or all of them are outside those terms and thus protectable. There is nothing in any of the statutory terms which suggest a different result for different types of computer programs based upon the function they serve within the machine.

The one District Court case which can be read as possibly supporting Defendant's position is *Apple v. Franklin,* 545 F.Supp. 812

(E.D.Pa.1982). That case is distinguishable, if correctly decided. It will be discussed in more detail later.

### (B) *The Legislative History:*

Any doubt as to whether the Copyright Act as presently worded protects computer programs of all types, however fixed, is removed by examining the legislative history of the 1980 Act and particularly the work of CONTU.

CONTU is an acronym for the National Commission on New Technological Uses of Copyright Works. That Commission was set up by Congress in 1974 to consider major public policy questions of concern to Congress in the copyright field. The Commission consisted of eminent experts in copyright law, public representatives and representatives of publishing and allied industries directly concerned with copyright matters. Among the problems Congress asked the Commission to consider was the extent to which computer programs should be protected by the copyright laws.

It is crystal-clear that CONTU recommended that *all* computer programs, fixed in any method and performing any function, be included within copyright protection. There likewise can be no doubt but that Congress accepted that recommendation and embodied it in the 1980 amendments to the Copyright law.

The commission was not unanimous on this subject. Commissioner Hersey, who wrote a dissent, recommended only limited protectability for computer programs. *See* Final Report of the National Commission on New Technological Uses of Copyrighted Works, p. 17 (1978) [hereinafter CONTU Report]. He urged that programs "capable of being used to control computer operations" be excluded from protectability, the very same contention Defendants make here.

Defendants argue that Commissioner Nimmer took the same position. In the Court's view, Defendants have misread the Nimmer position. Professor Nimmer did not join Commissioner Hersey in recommending that the law be presently written so as to exclude from protection computer programs embodied in a form which could be used merely to control computer operations. Nimmer said he would consider such a limitation later on and might recommend it later on if he became convinced that the majority's view of unlimited copyright protection for all computer programs proved "unduly restrictive." CONTU Report, pp. 26–27. So Professor Nimmer interpreted the majority recommendation as the Court has characterized it and endorsed that recommendation for that time at least. Professor Nimmer rejected at that time the limitation suggested by Commissioner Hersey and these Defendants.

Another Commissioner, Ms. Karpatkin, in a separate dissenting opinion, likewise seems to characterize the majority view as recommending total and complete copyright protection for all computer programs, and argues for more limited coverage. CONTU Report, p. 37.

Even counting Nimmer as a sympathizer, the dissenters make up a small minority. Moreover, the majority of the Commission specifically addressed and rejected the Hersey position, although they called it the "Nimmer Suggestion." The Commission stated in this regard:

> "This distinction is not consistent with the design of the Act of 1976, which was clearly to protect all works of authorship from the moment of their fixation in any tangible medium of expression. Further, it does not square with copyright practice past and present, which recognizes copyright protection for a work of authorship regardless of the uses to which it may be put. The copyright status of the written rules for a game or a *system for the operation of a machine* is unaffected by the fact that those rules direct the actions of those who play the game *or carry out the process. Nor has copyright been denied to works simply because of their utilitarian aspects. It follows, therefore, that there should be likewise no distinction made between programs which are*

*used in the production of further copyrighted works and those which are not."* CONTU Report, p. 21 (Emphasis supplied).

To achieve their recommended objective of full protectability of all types of computer programs, CONTU recommended the repeal of § 117 (and the substitution of new language under that section number on a related but different issue) and the addition in § 101 of a broad definition of the term "computer program".

Congress wrote into law verbatim the majority recommendations without modification or addition (except for minor changes not pertinent here). It must, therefore, follow that Congress likewise did not intend to make any distinction between "programs which are used in the production of further copyrighted works" and those which embody "a system for the operation of a machine."

(C) *Public Policy:*

The Court has already indicated that the copyright law as now written includes protection of all computer programs, regardless of their function or purpose. It has also been demonstrated that if, arguendo, the law is viewed as uncertain in this respect, that result is dictated by the legislative history. Additionally, the Court finds that this construction accords with public policy considerations.

Defendants claim that for policy reasons, the copyright law ought not be construed so as to support Apple's action to establish and enforce copyright protection for the five programs involved. Defendants portray this case as part of an attempt by a large established computer firm to preserve its market position and hinder competition. That claim does not square either with experience or the evidence in the case.

Hundreds of independent firms have entered the computer equipment and program field in recent years, many with substantial success. Many of these enterprises, in fact, produce software for Apple computers. There is nothing in this history to suggest that one large firm, such as Apple, is capable of "dominating" such an expanding market.

Apple, to the contrary, has no desire to restrict the growth of program-writing firms. Purchasers of computer hardware are greatly influenced in their selection by the availability of software compatible with a given model. The greater the variety of programming available which is designed for use on Apple computers, the greater is the Apple computer's appeal.

This case, of course, centers on the protection of software produced by Apple itself. But Apple does not dispute the right of Defendant to market programs which perform the *exact same function or purpose* as do Apple's own programs. The gravamen of Plaintiff's complaint is that Defendant should not be allowed to market programs which perform the same function in the *exact same manner* as Plaintiff's. Quite simply, under the Court's decision, Defendant will still be free to produce programs which result in the machine performing the same calculations, set-ups, memory loading, etc., as Plaintiff's software does and thus compete with Plaintiff in the software market. Defendant will not, however, be free to do so by copying the exact number and sequence of bytes or items by which Plaintiff's program causes the machine to operate. As the CONTU Report aptly put it [21], "One is always free to make the machine do the same thing as it would if it had the copyrighted work placed in it, but only by one's own creative effort rather than by piracy."

Such a "restriction" is hardly an impediment to free competition in the market place. Plaintiff has introduced evidence, which was not directly controverted by Defendant, that numerous methods exist for writing the programs involved here that would be "98% compatible" with Apple computers, yet not so similar to Plaintiff's particular sequence as to infringe its copyright. If there were only one or two ways to write a program for a particular function, then extending copyright protection to the program might in effect give its author a patent on the idea itself. But those facts do not exist in this case.

By contrast, if it were left free to copy, Defendant would be able to appropriate to its own use Plaintiff's substantial research and development costs. Such appropriation is quite feasible; the testimony from experts offered on this motion confirms that the process of duplicating or copying a program, once it is put into usable form in a ROM or diskette, is almost absurdly simple. Diskettes can be copied for a minimal cost by anyone with rudimentary technical skill and a few pieces of equipment, and ROMs require only slightly greater sophistication.

Apple seeks here not to protect *ideas* (i.e., making the machine perform particular functions) but rather to protect their particular *expressions* of those ideas in the form of specific programs. And Formula wants the privilege of using and marketing those expressions without having to invest the millions of dollars and thousands of manpower hours necessary to develop them. Simple economics suggests that Formula's strategy would hinder, not promote, competition and innovation in the computer market. Few companies are going to invest the time and resources to develop new programs if their products can be freely duplicated by anyone. Such "competitors," who could undersell the originator simply because they don't have its development costs, would destroy the market which any innovator needs to recoup his investment.

There has been considerable discussion, in the briefs in this case and in the technical and legal literature, about whether copyright is the best form of protection for computer programs, assuming that some protection is necessary. It may be that the copyright law is not the most appropriate shelter under which to place this form of new technology and, as some commentators have suggested, a hybrid or entirely new form of protection will have to be devised. That, however, is up to Congress. This Court does not have the prerogative of investing a new form of protection even if it wanted to. To the extent it is free to express public policy, its choice is to place computer programs into an existing category of legal protection as against affording them no protection at all. As previously indicated, there are strong policy justifications for extending protection to computer programs. As for the type of protection, the Court notes that CONTU analyzed all of the alternatives—including patent, trade secrecy, and unfair competition—and concluded: "Each of these forms of protection may inhibit the dissemination of information and restrict competition to a greater extent than copyright." CONTU Report, p. 16.

## V. THE STANDARD FOR PRELIMINARY INJUNCTIONS

The moving party's burden to justify a preliminary injunction differs among the various Circuits. In our Circuit, the Ninth, the burden may be met by demonstrating:

(1) A combination of probable success on the merits and the possibility of irreparable injury, or

(2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor.

*William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 526 F.2d 86, 88 (9th Cir.1975).

More recent Ninth Circuit authority points out that the two standards set forth above are actually not separate tests but are the "outer reaches" of a single continuum; the greater the balance of hardships tips in favor of the moving party, the less likelihood of success on the merits must be shown. *Los Angeles Memorial Coliseum v. NFL,* 634 F.2d 1197, 1201 (9th Cir.1980).

[3] The Court finds that the danger of irreparable harm to Apple is apparent and significant, while the hardship to Formula of delaying its more extensive entry into the computer market until a decision on the merits is minimal, especially given the insignificant role such sales currently play in Formula's business. Thus, under the governing standard, Apple is entitled to an injunction on copyright grounds.

It is interesting to note that in the only two decisions in this Circuit concerning

computer programs, and involving similar copyright issues, preliminary injunctions have also been granted. *Hubco Data Products Corp. v. Management Assistance, Inc.,* No. C81–1295 (D.Idaho Feb. 3, 1983); *GCA Corp. v. Chance,* No. C82–1063 MHP (N.D. Cal. July 12, 1982) (both unpublished).

## VI. THE FRANKLIN CASE

Before concluding, it is appropriate for the Court to discuss and distinguish the decision of Judge Clarence C. Newcomer in *Apple Computer, Inc. v. Franklin Computer Corp.,* 545 F.Supp. 812 (E.D.Pa.1982), which was prominently mentioned during the oral argument. An analysis of that case is important not only because the opinion is thoughtful and scholarly but also because the plaintiff is the same and its complaint was framed identically with the complaint here. Moreover, that case involves (among other items) the same Apple ROMs and diskettes that are involved in this case and that defendant, Franklin, was accused, as here, of copying them in the production of a competing personal computer.

Several reasons impel this Court, after much thought, to decline to follow Judge Newcomer in his refusal to grant a preliminary injunction. First of all, the standard for such injunctions in his Circuit, the Third, is different and more onerous to the plaintiff. The Third Circuit standard, summarized by Judge Newcomer at 545 F.Supp. 825, requires these showings:

"(1) A reasonable probability of success on the merits [and]

(2) Irreparable injury to the plaintiff that exceeds any injury to the enjoined defendant . . . ."

(There are also some other requirements in the Third Circuit which are not relevant here.)

In applying the Third Circuit standard, particularly No. 2 above, Judge Newcomer pointed out that the defendant Franklin had no business other than producing the personal computer at issue. Thus the granting of a preliminary injunction would have a "devastating effect" upon it. As noted above, Formula is in a quite different position.

Secondly, at about the time the opinion in *Franklin* was rendered, Judge Newcomer's own Circuit Court came down with *Williams Electronics, Inc. v. Artic International, Inc.,* 685 F.2d 870 (3rd Cir.1982). The basic issue in *Williams* as to copyrightability, was similar to the one presented to this Court. Defendants in *Williams* appeared to argue that all ROMs are excluded from copyright protection. But the rationale they advanced is the same as the rationale which Formula advances in this case: that since a ROM is used to control the activity of machines, it is an "utilitarian" use not subject to copyright protection. They, like Formula here, based this contention on § 102(b). They also relied heavily on the District Court decision in *Data Cash Systems, Inc. v. JS & A Group, Inc.,* 480 F.Supp. 1063 (N.D.Ill.1979), aff'd on other grounds, 628 F.2d 1038 (7th Cir.1980). (Parenthetically, the Seventh Circuit treatment on appeal of the District Court's *Data Cash* opinion, in this Court's view, completely undermines the authority of the trial court's opinion, and our Defendant, Formula, expressly abjures any reliance on *Data Cash.*)

In any event, the Third Circuit in *Williams* affirmed a permanent injunction for the copyright owner. The opinion seems to hold squarely that all ROMs, regardless of their "utilitarian" function, are copyrightable. The Court said:

"Defendant argues that the basic question presented is whether the ROMs, which it views as part of a machine, can be considered a 'copy' of a copyrighted work within the meaning of the Copyright Act. Defendant argues that a copyright for a computer program is not infringed when the program is loaded into electronic memory devices (ROMs) and used to control the activity of machines. That use, it claims, is a utilitarian one not within the scope of the Copyright Act . . . ' The answer to defendant's contention is in the words of the statute itself. A 'copy' is defined to include a material object in which a work is fixed 'by any method now known or later de-

veloped, and <u>from which the work can be perceived</u>, reproduced or otherwise communicated, either directly or <u>with the aid of a machine or device.</u>' 17 U.S.C. § 101 (emphasis added). By this broad language, Congress opted for an expansive interpretation of the terms 'fixation' and 'copy' which encompass technological advances such as those represented by the electronic devices in this case. We reject any contention that this broad language should nonetheless be interpreted in a manner which would severely limit the copyrightability of computer programs which Congress clearly intended to protect."

685 F.2d at 876–77 (underscoring supplied).

*Franklin* is on appeal and that appeal has already been argued, so the present authority of the District Court opinion is uncertain.

It should also be noted that in the *Franklin* opinion Judge Newcomer makes no *holding* on the copyrightability question. He limits himself to expressing doubts about the copyrightability arguments espoused by Apple. He nonetheless describes these arguments as "strong." His *holding* is that, for the purposes of a preliminary injunction motion, in the balancing of equities between the parties before him and applying the Third Circuit standard, he declines to issue the preliminary injunction.

Although the matter is not critical to Judge Newcomer's decision, the Court also notes his description of the CONTU majority view. With respect, it does not seem he has accurately characterized it on this issue.

All in all, I conclude that the District Court opinion in *Franklin* is greatly undermined by the *Williams* decision as to the scope of the Copyright Act. Furthermore, *Franklin* is a different case, decided under different injunction standards and without a clear holding. Thus it should be viewed as a precedent which does not, and should not, guide this Court.

## VII. TRADEMARK MATTERS

■ As mentioned above, the Court has decided to issue a preliminary injunction as to the trademarks involved.

Certain essential findings and conclusions underlie that decision in accordance with the Ninth Circuit standards. The Court finds that Apple has shown a reasonable probability of success on the merits. The Court further finds that use by the Defendant of the names "Apple" or "Pineapple" would be confusingly similar to the Plaintiff's use of its Apple trademark and trade name when used on related goods.

Under the Ninth Circuit test, the Court also finds that Plaintiff has demonstrated a strong possibility of irreparable injury to itself and that the balance of hardships tips sharply in its favor.

## VIII. UNFAIR COMPETITION

The Court expresses no views and makes no findings on Plaintiff's alternative theory of unfair competition. The relief which has already been granted should be totally adequate to the Plaintiff's requirements and objectives *pendente lite*. Thus it is unnecessary to base relief, even alternatively, on any unfair competition theory.

## IX. OTHER MATTERS

Defendant has raised a number of other contentions such as collateral estoppel, misuse of copyright, and misrepresentation. These have been considered and they do not alter the Court's finding that Plaintiff has shown a probability of success on the merits.

Attached hereto as Exhibit 1 is the Preliminary Injunction which will issue.

## EXHIBIT 1

## PRELIMINARY INJUNCTION

IRVING HILL, District Judge.

Plaintiff's motion for a preliminary injunction was filed September 27, 1982. The motion was argued on December 27, 1982. Appearances were: for Plaintiff, Brown & Bain of Phoenix, Arizona, by Jack E. Brown, Esq., and Lois W. Abraham, Esq.; for Defendant, Thomas E. Schatzel, Esq., of Santa Clara, California, by Bruce G. Spicer, Esq.

By letter to counsel filed December 23, 1982, the Court advised counsel that a preliminary injunction would be issued with respect to Defendant's trade name but reserved decision as to the other aspects of the motion.

By Memorandum filed April 11, 1983, the Court held that a preliminary injunction would also be granted as to the copyright issues. Said Memorandum contains the findings of fact and conclusions of law which underlie this entire preliminary injunction.

The Court having considered the said motion and the various evidentiary materials and Points and Authorities filed in support thereof and in opposition thereto and having heard argument, IT IS ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1. Pending the trial of the action or further order of the Court, Defendant, its officers, agents, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this preliminary injunction order, are restrained and enjoined from, directly or indirectly:

(a) Using the mark or name APPLE, PINEAPPLE, or any other mark or name embodying the word or term "apple" or any other trademark or trade name confusingly similar to the trademarks and trade names of Plaintiff.

(b) Copying any of Plaintiff's copyrighted computer programs as embodied in silicon chips, ROMs or diskettes. Without limiting the foregoing, there shall be expressly included in this subparagraph (b), Plaintiff's Autostart ROM, Applesoft, HELLO, DOS 3.3 and Apple Integer BASIC.

(c) Importing, distributing, selling or advertising for sale any silicon chips, ROMs or diskettes which contain any copy of any of Plaintiff's copyrighted computer programs.

2. Not later than Friday, April 15, 1983, Plaintiff shall post an injunction bond, in cash or written by a corporate surety qualifying under the Court's Rules, in the sum of $500,000 and this preliminary injunction shall be subject to the deposit of said bond within said period.

3. The Clerk shall transmit a copy of this Preliminary Injunction by United States mail to counsel for both sides.

DATED: April 11, 1983.